Good morning, your honors. My name is Jason Saunders of Gordon and Saunders. I represent LaWanda Johnson. Present with me is Greg Linkweb from the Washington Appellate Project, who's here for Dr. Johnson. I'd like to reserve five minutes, if I may. Where are we going to divide between you and your co-counsel? That's about to get into that. What we'd like to do today is, I'm going to argue the credibility jury instruction for this and answer any questions specific to LaWanda Johnson's sentencing, the number of victims, as well as the loss calculation. Mr. Link is here to talk about the forfeiture issue briefly and will also be available to answer any questions the court has concerning Dr. Johnson's pro se brief, as well as the remaining issues. Do you want to divide by time or just get going? Just get going. All right. Thank you, your honor. At the end of our case, we asked for an accomplice credibility jury instruction, which the district court refused, at first finding that LaWanda Johnson didn't have enough evidence to show that Beth Hughes was an accomplice. We find that was error. She is an accomplice because an accomplice is someone who assists and encourages or is part and parcel of a crime, along with the principal. In fact, the jury instruction, 4.9, the model jury instruction, says an accomplice is someone who is involved in the crime, who voluntarily and intentionally is involved in the crime. Beth Hughes actually testified that she was the person who did the upcoding. She was the person who billed everything to Medicaid and the other offices, and therefore she was aiding and assisting. She was part and complicit in the crime of health care fraud. So we find that was error. The government has an issue whether or not she could have been indicted for the crime. I think she could have been indicted. The fact that there wasn't any promise not to charge her if she testified really is not the test. The test... Would you address... Let's say that we agree with you that, you know, basically she did a little more than turn a blind eye here. The prejudice issue, then, is right on the table, given all the other evidence and the other people and the documentary evidence. So even if the accomplice liability instruction had been given, or since it wasn't, what's the prejudice here in light of the other evidence? Very briefly, you know, that instruction is, whenever requested, should be given. I mean, that's what the committee says in the comments for that, and also this Court's decision in Davis, whenever it's requested, it should be given. The prejudice in this case actually goes to how important was Beth Hughes. Beth Hughes was the only person who actually testified that Ms. Johnson had knowledge of the upcoding and overbilling to Medicaid. The only other person that the government can bring out is Barbara Phillips, who said, well, I brought it to Ms. Johnson's attention that I thought some of these were upcoded, but she didn't know and she couldn't testify. She was asked whether or not that was submitted, who submitted it, and whether it was ever upcoded or not in the end. So that's a very small leak and a very weak evidence. Without Beth Hughes saying that it was Ms. Johnson who directly told her to do it this way, we would have had no other evidence that Ms. Johnson was involved at all. Ms. Johnson certainly did not do the upcoding, did not bill. That was Beth Hughes who did that. She's been involved with the office since November of 2003, and she was the one who was primarily responsible for doing that. And she also had an incentive for doing that. She had a very meager salary of $25,000 a year, says I. But she had a bonus included. If she made above $7,500 a week for the clinics, she would get a $50 bonus. And if over $9,000, a $100 bonus. It doesn't sound like a lot of money until you consider the fact that that's something like a 21% increase in her salary if she made the $9,000 every week for a year. Who set up the bonus system? LaWanda Johnson and Dr. Johnson. And wasn't that pretty compelling evidence? Because, as you say, her share was pretty tiny. Their share was pretty large. And I agree with that. But what I think what we need to look at is whether or not that was, you know, I'm speaking for LaWanda Johnson, but that might have been Dr. Johnson who decided that was the proper way to go or not. Ms. Johnson certainly argued that she never told her to upcode. In fact, the policy was to always err on the side of caution and never overbill. So her testimony was I didn't do it. Beth Hughes did it. She had a motive for doing it. I never knew what was going on, and I trusted her for doing it because she was the billing clerk and she was the one who knew how to bill. So we did have a conflict between the testimony of these two individuals, and it was really for the jury to decide which was more credible. And that brings me to the facts of Davis. You know, Davis is a lot like our case. Davis was a case where two people crossed the border into the United States and Mexico. After going through the border, one of them is found to have possession of controlled substances on his body. He implicates the co-defendant and says, well, he knew about it. In fact, he told me to wrap him around my leg, and that's what happened. Certainly in that case, that person was given some kind of promise from the prosecution about not being charged with the crime, but it went to the knowledge that this person, this Davis in the car, knew that drugs were in the car. And the same thing applies here. This information from Beth Hughes was the only link that said she knew what was going on and she was part of this. Your client was the office manager. Complaints had been received following the audits about practices. Was she unaware, even following the results of the audit, as to what was going on in the office that she was the manager of? Well, Your Honor, I would argue in this case that that might go to a very, you know, she used to be a principal from California. She came out here, became office manager for her son. She testifies that she did a lot of daycare for her son and pretty much was ordering supplies for the office, as well as trying to get certain federal regulations met for other things. She trusted this woman, Beth Hughes, to do all the building. So her story is certainly that she was unaware of it. But what about, I mean, there's an audit done. It's kind of a red flag, so what is your response to the red flag? I agree. And that might go to, you know, perhaps she was negligently an office manager. She just didn't know what she was doing. They fought it and maybe she was just naive and should have done a better job. But it doesn't go to her actual knowledge that this was done. And the only person that actually could make that link was Beth Hughes. I'd like to talk a little bit quickly about why the credibility instruction, the one that was given, was insufficient. And the reason why is because that instruction is very simple. It's given about every witness that ever comes before the court. It says you can look at their ability to hear, see, and the way they testify. But an important aspect of that general credibility instruction is that you can also look, as the jury, the motivation or the interest in the outcome of the case. What that instruction actually did was tilt the scale towards believing Beth Hughes. Because the one person who had a really interest in the health care fraud was Lawanda Johnson. Certainly the jury didn't think Beth Hughes had any interest, that she wasn't being charged with any crime that the jury knew of. So that actually tipped the balance, the scale and balance of Beth Hughes' credibility. The accomplice jury instruction was really necessary in this case because we needed to at least have a level playing field. That instruction would just have said, look, Beth Hughes admitted she was an accomplice. And you should be able to think about that factor and how it might have influenced her testimony and give greater caution when you consider that testimony compared to anyone else. So that actually would do at least level the playing field. Without that, it's just not sufficient. And this court in Barnard made it quite clear that summation arguments and things like that are just not the same. It's found it very unpersuasive that that is sufficient to prove that the person is an accomplice. And the reason why is because we have jury instructions like 31 and 8 in this case that says closing arguments are not evidence. And also an instruction that says the only evidence you must consider is the testimony and the exhibits offered as well as these instructions given. So the jury had no ability to consider her as an accomplice and consider her testimony. And worst of all, they could not determine that she should be viewed with extra caution like any other accomplices. Accomplices should be viewed with some suspicion because they are involved in the crime. And we don't know what happened in this case. Perhaps Beth Hughes was someone who thought she was in a lot of trouble and decided to fully cooperate with the government, and that's why she decided to testify. Just because the government didn't need to make a deal with her doesn't preclude the fact that she is an accomplice. I think I'm going to yield the rest of my time right now to Mr. Link unless the Court has any questions. I think not. Thank you. Thank you. Good morning. As Mr. Saunders says, my name is Gregory Link and I represent Dr. Antoine Johnson in this case. The forfeiture order in this case deprives the defendants of their Sixth Amendment right to a jury trial. Why isn't that precluded by the Phillips case? I think Alene illustrates a flaw in the ruling in Phillips, and that is Phillips found that since the forfeiture statute didn't set a statutory maximum on the amount of forfeiture, that it couldn't implicate Apprendi and Blakely. And Alene makes clear that a maximum is not all that triggers the Sixth Amendment. In fact, a minimum triggers the Sixth Amendment as well. And the way the forfeiture statute is structured, the proceeds, I should say, that the amount that may be forfeited is zero unless there's some establishment that proceeds were derived or traceable to criminal activity. I guess going back to Judge Rickoff's question, I hear your argument of this little slice of where you think Alene may factor in, but we're just a three-judge panel bound by Phillips. I do appreciate that. I understand you have to make your argument. But I think it's important, too, that the Phillips panel didn't have the benefit of the Alene decision either. It was decided a few months prior to the Supreme Court's most recent pronouncement on the breadth of the Sixth Amendment. I think it's an important point because of that. And, two, to the extent that the court or the state or government, excuse me, believes that Libretti is somehow controlling. I think it's important, too, there to look at the fact that Libretti was asking a fundamentally different question than what we're asking this court to ask. In Libretti, the court was asking where the Sixth Amendment does not apply to facts that establish punishment and forfeiture as punishment does the right to a jury trial attach. Now, we know that's not the question any longer. Instead, the question is where the Sixth Amendment does apply to facts that set both the minimum and maximum punishment. And we know that forfeiture as punishment does the right to a jury trial attach. It's a different question than what the court in Libretti was asking. And I'd ask the court to ask that question in that context, despite Libretti, despite Phillips. And I think it's also important to point out that in Libretti, the court said, look, forfeiture is just like monetary punishments, fines, and we don't apply a jury trial right there. But yet, in Southern Union now, we know that that's not the case any longer either. Forfeiture is like fines. Fines are subject to the right to a jury trial. We believe that forfeiture should be subject to the right to a jury trial as well. So we'd ask the court to- Again, those arguments were all addressed in Phillips, yes? Without the benefit of a lien, though. So your argument has to rest totally on that a lien has changed the whole- And again, Phillips specifically says that because the forfeiture statute doesn't set a maximum, the right to a jury trial doesn't attach. And a lien makes clear that that's not a relevant distinction, that the maximum itself is not determinative of the jury trial right. And since the forfeiture statute does operate to set a minimum at a minimum, that we think a lien has changed the analysis substantially from what Phillips had. Unless the court has any additional questions specific to Dr. Johnson on that point. I would ask the court to consider the claims that Dr. Johnson has raised in his press brief. Right. They are substantial claims. They would fundamentally alter the outcome of the trial, and I have asked the court to consider those in the course of its decision in this case. Thank you. Thank you. Thank you. May it please the court, Susan Lloyds for the United States. I want to address the accomplice instruction first. It was not an abuse of discretion for the court to decline to give an accomplice instruction for at least four major reasons. The first reason is that LaWanda Johnson testified at trial that almost all of the counts alleged as healthcare fraud, both in the indictment and in the Medicaid audit were properly billed, and thus were not upcoded. So if there is no crime, how can there be an accomplice? Is it your position there was no crime? It was Ms. LaWanda Johnson's position that there was no crime. Well, sure, but there are co-defendants all the time, and they're all saying we're innocent, and that isn't accepted by the court as a fact. Well, we don't have to worry about the limitations on testimony by co-conspirators. What I would say is that her position is inconsistent with what she later asked the court to do, which is to give an accomplice instruction because she basically was saying that there was no crime. No, I don't think I'm saying that, Your Honor. Okay. So what's different about what you're saying? Well, I'm saying what her position is completely internally inconsistent, and I think it's proper for a jury to consider internally inconsistent arguments with one defendant. She makes one argument that's contradicted by another argument that she also makes. In this case, she complains or contends that Beth Hughes was the only one who committed the crime. And the government's contention is to the contrary. That's correct. I don't understand why the government's contention should be disregarded when it comes to giving an accomplice instruction. Well, let me point out that the accomplice instruction, when we look at what an accomplice is, according to Mr. Saunders' brief, is one who knowingly and voluntarily with common interest unites with the principal offender in the commission of a crime, and one who is some way concerned, and I think the most important part of this, a person is liable as an accomplice to the crime of another if he gave assistance or encouragement or failed to perform a legal duty with the intent to promote or facilitate the crime. How does that description not fit Ms. Hughes? Ms. Hughes was not at the front desk. She didn't see what went on with the interactions between Antoine Johnson, the nursing assistants, and so forth. All she saw was what was on the billing sheets. If Dr. Johnson's name was on the billing sheet, she was told Dr. Johnson saw the patient. Now, we know that that isn't necessarily the case, given the fast track program, which was divined by the Johnsons, clearly not divined by Ms. Hughes. And the very setup of that program was designed to result in health care fraud, and that is two out of three visits with patients would be with a nursing assistant or a medical assistant and not with a physician or another person who could properly bill. You're arguing for the defendant's guilt. My focus is purely on the accomplice instruction, and you need to be careful with what you ask for because you don't want to reach a conclusion, I think, that says only a principal can be liable for health care fraud. I agree with that. So why is it that Ms. Hughes couldn't have been charged as an accomplice aiding and abetting conspiracy? I think she probably technically could have been charged. So doesn't that make her potentially an accomplice and trigger the accomplice instruction? Well, the question then I think goes to the weight of the evidence as to whether or not LaWanda Johnson's guilt was proven. And LaWanda Johnson, of course, argued that all of the fault was Beth Hughes's fault. She said as to the upcoding, the question is, was the upcoding, the health care fraud, was that done by Beth Hughes alone or was somehow LaWanda Johnson involved? And Ms. Johnson's counsel said the answer from our point of view of the evidence, it was Beth Hughes who was solely responsible for the health care fraud. So she's saying if there was health care fraud, it's totally Beth Hughes's responsibility. I don't understand how that speaks to the accomplice question, instruction question. This isn't a challenge to sufficiency of the evidence. It's a challenge to whether an accomplice instruction should have been given, and if it should have been, was the weight of the evidence such that the failure to give it was harmless. What defendant's position was really doesn't speak to what the weight of the evidence was. Well, the weight of the evidence is substantial in this case. And, again, I would point to the fast track program. There was no question that that was a program developed by the Johnsons and not by Beth Hughes. There is no question that it resulted in upcoding. It was not a program that was designed by Beth Hughes. It was designed particularly by the Johnsons, and that was their business plan. Well, the defense we just heard, and I'm sure you were paying attention, the co-defendants or at least one co-defendant is willing to point at her son. And the argument we just heard is that the only direct evidence of Ms. Johnson's involvement was the testimony of Beth Hughes. Is that true? That is not true. The receptionist, Wanda Hines, for example, worked in the Olympia Clinic. She was told to pass out prescriptions when there was no provider in the clinic. Ms. Johnson was the office manager. She claimed to be the office manager for all of the clinics. The jury could consider Lawanda Johnson's statement to Ms. Hines that Scotty Millar could have made the Olympia Clinic a success if he would prescribe narcotics, again, showing that Ms. Johnson's emphasis was on making money for the clinics by willing to fast-track patients on narcotics rather than providing medical care on a regular basis. Now, that's not something that Beth Hughes would know about what was happening in the Olympia Clinic. The jury could consider Lawanda Johnson's testimony that she periodically audited Beth Hughes' work and her statement that she, Lawanda Johnson, had to know how to bill in order to supervise. And that's our excerpts of Record 938 and 1001. In addition to all of that, the jury could consider all the other evidence of the defendant's fraud and manipulation, where they, for example, manipulated their tax returns by mixing cash and accrual accounting, among other manipulations to avoid paying taxes. And the jury, of course, could consider their flight to Scotland and then to Madagascar shortly after the search warrants, which shows consciousness of guilt. Given all of that overwhelming evidence, for all of the reasons, the court did not abuse its discretion in deciding that an accomplice instruction was warranted. The credibility instruction allowed Ms. Johnson to argue, which she did, that Beth Hughes was solely responsible. Clearly, the jury's verdict speaks for itself in terms of how the jury came out on that, because they convicted the defendants of every single count of health care fraud but one. And the only one they didn't convict on was one that had been charged as there should have been no bill submitted because it was performed by someone who couldn't bill. And because there was testimony of one witness that said from the L&I program, Labor and Industries program, that she would have allowed that to be billed, that explained the jury's verdict. I would like to, if the court has, I don't think the defendants raised any questions with respect to the sentencing issues as to the amount of loss or the number of victims, except in their briefs. If you have any questions about those issues, I'm prepared to respond to them. So should not the judge have used a clear and convincing standard to calculate the amount of loss? I think the defendants waived that by not raising that issue. It's clear that they did not raise it, and therefore we could only consider it on a plain error. But I want to know what your position is as to whether it should have been, assuming they had raised it or assuming it would be plain error, should it have been clear and convincing evidence? I think under either standard, the standard was met by the analysis that was put forth in the sentencing memorandum. The fast track program was a routine program that basically put into pattern, the pattern of how billing was going to be done. So even with a clear and convincing standard, I think the standard was met. Give you some statistics. As we know from the fast track program, those people were seen by a nursing assistant or a medical assistant only two out of three times. And you would expect if they billed it properly that there would be a lot of visits billed at the one or two level billing. But for the data in their own computers, however, refuted that. For example, in 2005, there were 7,023 visits billed at a level 1-4, which is for established patients that's the second highest level, 7,023 visits. There were 48 visits billed at a level 1-2, which is a lower level visit. That's a remarkable number and I think speaks for itself with respect to the amount of fraud that was going on and lost to the programs. In addition, the loss as determined in our sentencing memorandum was based on amounts paid to the clinics rather than the higher amount billed. So we gave them credit, didn't ding them, even though they billed a higher amount. We gave them the benefit of doubt that they could rely on what was paid rather than what was billed. Any other questions on the loss calculations? No. Any questions on the number of victims issue that you would like me to address? No. Okay. Any questions? Well, let me talk about the supervision. We would simply If you have a question, we'll ask it. Okay. And are there any questions that you have on a lien or on the substance abuse treatment program issues? Okay, hearing none, I'll sit down. All right. Your Honors, I don't think I need to spend any more of your time, and I'm just here to answer any questions about the sentencing factors for my client. If you have any, I think the only argument I would make very briefly here is for all sentencing enhancement issues, I think this is a case that illustrates a burden of production that's not met. All these kind of extrapolations and speculations, taking a few numbers and saying, well, this all means that the loss must be that is highly speculative. But especially for the number of victims, probation agreed with us that the number was less than 10, and they want to talk about identified people that might not have asked for restitution, but they never identified who those people are. So it's just simply a preponderance of the evidence, sure, for that one. But, you know, what is the burden of production? Just name the people you want to call victims, unless the Court has any other questions. We rest on our briefing. All right. Thank you. Thank you. Thank you. It's often difficult with co-defendants or co-appellants to allocate time, but you've done it as effectively as I've seen it done. The case just argued, United States v. Johnson & Johnson, is submitted, and that concludes the calendar for this morning.
judges: Rakoff, McKeown, Clifton